MRS. H. A. ALLEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

H. A. ALLEN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MRS. W. N. MAER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. N. MAER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. W. SILK AND MRS. W. W. SILK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. T. WILLIS AND MRS. W. T. WILLIS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 7289, 7290, 7854, 7855, 10864, 15679. Promulgated September 7, 1927.

1. Where three members of a partnership composed of a larger number of members, without the knowledge of the other members filed articles of incorporation for the purpose of incorporating a part of the business of the partnership and proceeded to do business without the consent of the other partners and without subscribed or paid-in capital stock and without directors or officers and carried on either with the funds of the partnership or on borrowed money, and where in three months articles of dissolution were filed and thereupon the partnership came into possession of all its assets and paid or assumed all its liabilities, *held*, that the partnership was not in receipt of a liquidating dividend.

2. Discovery value determined.

3. Rate of depreciation on tank cars and an oil refinery determined.

4. Amount paid by a partnership which was employing nonunion labor to an association organized to protect such employers against what they conceived to be the dangers of union labor is deductible as an ordinary business expense.

5. The Board of Tax Appeals is without jurisdiction to revise a determination by the Commissioner of an overassessment.

*Harry C. Weeks, Esq.*, for the petitioners.
*Maxwell E. McDowell, Esq.*, for the respondent.

The above proceedings have been by agreement consolidated and involve the following deficiencies in income tax: in the case of Mrs. H. A. Allen, the deficiencies are, for the year 1919, $1,963.38, and for the year 1920, $525.99; in the case of H. A. Allen the deficiencies are, for the year 1919, $1,825.54, and for the year 1920, $509.99; in the case of W. N. Maer the deficiencies are, for the year 1919, $11,055.01, and for the year 1920, $703; in the case of Mrs. W. N. Maer the deficiencies are, for the year 1919, $11,055.01, and for the year 1920, $703; in the case of W. W. Silk and Mrs. W. W. Silk the

deficiencies of the husband are for the year 1919, $4,235.29, and for the year 1920, $1,258.16, and for the wife for 1919, $8,953.43, and for the year 1920, $1,258.16; and in the case of W. T. Willis and Mrs. W. T. Willis the deficiency for each was for the year 1919, $1,862.25, and for the year 1920 the respondent determined an over-assessment for each of $49.12.

All of the above deficiencies, with an exception hereafter noted, grew out of the determination by respondent of the income of a partnership known as the American Refining Co., of which the petitioners were members, and involve the following issues: (1) The inclusion by respondent in income of the partnership of $504,701.80 which respondent treated as a liquidating dividend of the Wichita American Production Co.; (2) the proper amount of depletion on certain oil and gas leases; (3) the proper rate of depreciation on certain tank cars and (4) on an oil refinery belonging to the partnership; (5) the refusal of respondent to permit the following deductions from gross income of the partnership, to wit, $671.42 paid in 1920 to the State of Texas as a penalty for failure to file production tax reports as required by the law of that State, (6) amounts paid to the Federal Government in 1924 in settlement of pipe-line-transportation tax due for the years 1919 and 1920, and (7) the sum of $750 paid in 1920 to the Open Shop Association of Wichita Falls; and (8) an alleged loss of $8,006, arising from the worthlessness of an oil lease on Indian land in Tillman County, Oklahoma, which petitioners determined to be worthless in 1920.

In the case of W. N. Maer and his wife, petitioners further complain that respondent in determining the cost of a lease (known as the Maer-Silk-Willis Lease), which they sold in 1919, deducted from the original cost price depreciation and depletion which he had formerly allowed them. They complain further that respondent erred in his determination of the amount of the petitioner's income arising from the sale in 1920 of their interest in the American Refining Co.

### FINDINGS OF FACT.

The American Refining Co. was, during the years in question—1919 and 1920—a partnership. The number of the members of the partnership varied from 10 to 15. In the period from January 1, 1919, to May 1, 1919, the partners were P. P. Langford, W. W. Silk, N. B. Chenault, C. W. Reid, H. A. Allen, J. L. Art, J. G. Kilgore, W. N. Maer, W. T. Willis, W. F. Weeks, and M. J. Bashara. The wives of the various petitioners held interests in the partnership in community with their husbands. The interests of said petitioners in the partnership were, for the year 1919, as follows:

Per cent.

| | |
|---|---|
| Mr. and Mrs. H. A. Allen | 7.326 |
| Mr. and Mrs. W. N. Maer | 7.326 |
| Mr. and Mrs. W. W. Silk | 9.498 |
| Mr. and Mrs. W. T. Willis | 7.326 |

During the year 1920 the interests of the petitioners in the partnership were as follows:

| | |
|---|---|
| Mr. and Mrs. H. A. Allen | 575.5/7280ths |
| Mr. and Mrs. W. W. Silk | 726.6/7280ths |
| Mr. and Mrs. W. T. Willis | 287.7/7280ths |

Mr. and Mrs. Maer sold their interest in 1920. The partnership was managed by M. J. Bashara under the title of president, J. G. Kilgore under the title of vice president and general manager, and H. A. Allen under the title of secretary and treasurer. Bashara had the general management and control. The business of the partnership at first was the ownership and operation of an oil refinery. During the first part of 1919 the partnership began to purchase oil and gas leases for the purpose of supplying crude oil to the refinery. These leases were taken in the names of W. W. Silk, M. J. Bashara, and P. P. Langford as trustees for the partnership. The books of the partnership were kept on an accrual basis.

On April 25, 1919, Joe F. Cornish, in consideration of the sum of $50,000 cash paid him by the partnership, assigned and transferred to M. J. Bashara, W. W. Silk, and P. P. Langford, trustees of the American Refining Co., his right, title, and interest in an oil lease known as the Meadows Lease, on 38.82 acres in the L. Meadows Survey in Wichita County, Texas.

On April 18, 1919, A. C. Parks, in consideration of the sum of $40,000 cash paid him by the American Refining Co., transferred and assigned to W. W. Silk, M. J. Bashara, and P. P. Langford all his right, title, and interest in an oil and gas lease on 20 acres of land in Wichita County, Texas, in Block 87, Red River Valley Lands Subdivision. This lease is known as the Waggoner Lease. The said Silk, Bashara, and Langford held said lease as trustees for the American Refining Co., and in order to confirm this title they, on June 30, 1919, assigned and transferred the above lease to themselves as trustees for the American Refining Co.

On April 29, 1919, M. J. Bashara, J. G. Kilgore, and W. F. Weeks, without the knowledge of any of the petitioners, executed articles of incorporation of the Wichita American Production Co. and a supporting affidavit, and on May 1, 1919, filed both with the Secretary of State of the State of Texas. Said articles and affidavit are as follows:

STATE OF TEXAS
    COUNTY OF WICHITA

KNOW ALL MEN BY THESE PRESENTS:

That we, M. J. Bashara, J. G. Kilgore and W. F. Weeks, all citizens of Wichita County, Texas, under and by virtue of the Laws of this State, do hereby voluntarily associate ourselves together for the purpose of forming a private corporation under the terms and conditions hereinafter set out, as follows:

The name of this corporation is WICHITA AMERICAN PRODUCTION COMPANY.

The purpose for which it is formed is for the establishment and maintenance of an oil company with authority to contract for the lease and purchase of the right to prospect for, develop and use coal and other minerals and petroleum, also the right to erect, build and own, all necessary oil tanks, cars and pipe necessary for the operation of the business of the same.

The place where the business of the Wichita American Production Company is to be transacted is at Wichita Falls, Wichita County, Texas.

The term for which it is to exist is fifty (50) years.

The number of directors shall be nine (9), and the names and post office addresses are as follows:

| | |
|---|---|
| M. J. Bashara | Wichita Falls, Texas |
| P. P. Langford | Wichita Falls, Texas |
| N. B. Chenault | Wichita Falls, Texas |
| W. W. Silk | Wichita Falls, Texas |
| C. W. Reid | Wichita Falls, Texas |
| J. G. Kilgore | Wichita Falls, Texas |
| W. N. Maer | Wichita Falls, Texas |
| H. A. Allen | Wichita Falls, Texas |
| W. T. Willis | Wichita Falls, Texas |

The amount of the capital stock is Five Hundred Thousand ($500,000.00) Dollars divided into five thousand (5000) shares of One Hundred ($100.00) Dollars each, all of which capital stock has been subscribed and fifty (50) per cent paid in, as per affidavit attached hereto.

IN TESTIMONY WHEREOF we hereunto sign our names this 29th day of April, A. D. 1919.

M. J. BASHARA
J. G. KILGORE
W. F. WEEKS

STATE OF TEXAS
    COUNTY OF WICHITA

Before me, the undersigned authority, on this day personally appeared M. J. Bashara, J. G. Kilgore, and W. F. Weeks, known to me to be the persons whose names are subscribed to the foregoing instrument and severally acknowledged to me that he executed the same for the purposes and consideration therein expressed.

IN TESTIMONY WHEREOF I hereunto subscribe my name and affix the seal of my office this the 29 day of April A. D. 1919.

[SEAL]

WINIFRED K. DAVIS,
*Notary Public in and for Wichita County, Texas.*

STATE OF TEXAS

COUNTY OF WICHITA

Before me, the undersigned authority, on this day personally appeared J. G. Kilgore, M. J. Bashara and W. F. Weeks, known to me, who having been by me first duly sworn on oath say each for himself:

That they are the identical parties who executed the charter of the             as incorporator; that the full amount of the capital stock of said company has been in good faith subscribed and Two Hundred and Fifty Thousand ($250,-000.00) Dollars thereof paid in; that the following are the names and post office addresses of the parties subscribing to the capital stock, together with the amount subscribed and paid by each:

J. G. Kilgore, Wichita Falls, Texas, amount subscribed One Thousand ($1,000.00) Dollars; amount paid Five Hundred ($500.00) Dollars.

M. J. Bashara, Wichita Falls, Texas, amount subscribed Two Hundred and Sixteen Thousand Six Hundred and Sixty-eight ($216,668.00) Dollars; amount paid One Hundred and Eight Thousand Three Hundred and Thirty-four ($108,334.00) Dollars.

P. P. Langford, Wichita Falls, Texas, amount subscribed Fifty Thousand ($50,000.00) Dollars; amount paid Twenty-five Thousand ($25,000.00) Dollars.

N. B. Chenault, Wichita Falls, Texas, amount subscribed Fifty Thousand ($50,000.00) Dollars; amount paid Twenty-five Thousand ($25,000.00) Dollars.

W. F. Weeks, Wichita Falls, Texas, amount subscribed One Hundred and Eighty-two Thousand Three Hundred and Thirty-two ($182,332.00) Dollars; amount paid Ninety-one Thousand One Hundred and Sixty-six ($91,166.00) Dollars.

That the above subscriptions were paid in cash.

M. J. BASHARA.

J. G. KILGORE.

W. F. WEEKS.

Sworn to and subscribed before me this 29th day of April, A. D. 1919.

[SEAL]                                          WINIFRED K. DAVIS

*Notary Public in and for Wichita County, Texas.*

The statements in the affidavit that Kilgore, Bashara, Langford, Chenault and Weeks had subscribed for stock in such corporation and had paid in one-half of their stock subscriptions were untrue. None of the above persons, nor any one else then or thereafter subscribed for stock in the Wichita American Production Co., nor did any one of them pay in any money or property as part of the capital stock of such company. The Wichita American Production Co. never issued any certificate or certificates of stock. No money or property was ever paid in for or as capital stock. No stockholders' or directors' meeting was ever held and no directors or officers were ever elected. When the other members of the partnership were informed of the filing of the articles of incorporation they objected and steps were taken at once looking to its dissolution. In pursuance of this purpose M. J. Bashara and H. A. Allen executed articles of dissolution which were filed with the Secretary of State on August 7, 1919. These articles read:

THE STATE OF TEXAS.
   COUNTY OF WICHITA.

KNOW ALL MEN BY THESE PRESENTS: That we, the undersigned, being all of the stockholders of the Wichita American Production Company, a corporation duly organized under the Laws of the State of Texas, do each hereby consent, as evidenced by our respective signatures hereto attached that the said Wichita American Production Company shall upon and after the date of the filing hereof in the Office of the Secretary of State of Texas be dissolved as provided by law.

>                             W. F. WEEKS
>                             J. G. KILGORE
>                             M. J. BASHARA
>                             P. P. LANGFORD
>                             N. B. CHENAULT

We the undersigned M. J. Bashara, President, and H. A. Allen Secretary and Treasury of the aforesaid corporation, do hereby certify that the above and foregoing consent to the dissolution of the Wichita American Production Company is the True and correct action of the stockholders of the said Company and we do further certify that the names and addresses of the officers and stockholders of said Company are as follows:

### OFFICERS.

| Names: | Addresses: |
|---|---|
| M. J. Bashara, President | Wichita Falls, Texas |
| P. P. Langford, Vice-President | Wichita Falls, Texas |
| H. A. Allen, Secretary-Treasurer | Wichita Falls, Texas |

### DIRECTORS.

| Names: | Addresses: |
|---|---|
| M. J. Bashara | Wichita Falls, Texas |
| P. P. Langford | Wichita Falls, Texas |
| N. B. Chenault | Wichita Falls, Texas |
| W. W. Silk | Wichita Falls, Texas |
| C. W. Reid | Wichita Falls, Texas |
| J. G. Kilgore | Wichita Falls, Texas |
| W. N. Maer | Wichita Falls, Texas |
| H. A. Allen | Wichita Falls, Texas |
| W. T. Willis | Wichita Falls, Texas |

IN TESTIMONY WHEREOF, We have hereunto set our hands this 31st day of July, A. D. 1919.

>                        M. J. BASHARA
>              *President Wichita American Production Co.*
> (SEAL)                 H. A. ALLEN
>             *Secretary Wichita American Production Co.*

Sworn to and subscribed before me the undersigned authority by M. J. Bashara, this the 31st day of July, A. D. 1919.

>                        HULDO L. STEWERT
>                     *Notary Public for Oregon.*

My commission expires December 23, 1922.

Sworn to and subscribed before me, the undersigned authority by H. A. Allen, this the 5th day of August, A. D. 1919.

> (SEAL)                 HARRY C. WEEKS
>        *Notary Public in and for Wichita County, Texas*

The records of the County Clerk of Wichita County, Texas, show that the following six transfers are the only transfers to or from the Wichita American Production Co. on record in that county:

1 Assignment dated May 2, 1919, of J. G. Flowers and Seletha Cauble of all their interests in an oil and gas lease known as the Vogel Lease, on the south 10 acres of the NW ¼ of Block 74, Red River Valley Lands Subdivision. The consideration paid for this assignment was $70,000, which was paid out of the funds of the American Refining Co.

2. On June 30, 1919, the Wichita American Production Co. for the recited consideration of $10 and other valuable consideration, transferred this lease to P. P. Langford, M. J. Bashara, and W. W. Silk, Trustees for the American Refining Co.

3. On May 28, 1919, the Sammie's Oil Co., in consideration of $35,000, assigned its interest in an oil and gas lease on 10 acres in Blocks 96, 97 and 98, Red River Valley Lands Subdivision, Wichita County, Texas, to the Wichita American Production Co.

4. On May 31, 1919, the Sammie's Oil Co. executed a deed of correction of the above conveyance to the Wichita American Production Co.

There is no further record of the transfer of the leases mentioned in items 3 and 4.

5. On June 16, 1919, W. H. Slay, for the recited consideration of $10 and other valuable considerations, assigned to the Wichita American Production Co. his interest in an oil and gas lease on 15 acres in Block 96, Red River Valley Lands Subdivision.

6. On June 30, 1919, the Wichita American Production Co., for the recited consideration of $10 and other valuable considerations, assigned its interest in the lease assigned to it by Slay to the American Refining Co.

The only books of account kept by the Wichita American Production Co. were a cash book on which were entered its receipts and a journal on which were entered its disbursements. The journal was written up at one time, which date was subsequent to the dissolution of the corporation. The Wichita American Production Co. never made an income and profits-tax return.

The receipts of the Wichita American Production Co. from borrowed money were as follows:

| Date | Payee | In whose name borrowed | Amount |
|---|---|---|---|
| 1919 | | | |
| Apr. 25 | City National, W. F. | Wichita American Production Co. | $25,000 |
| 25 | do | do | 25,000 |
| 28 | First National, W. F. | do | 25,000 |
| 28 | do | do | 25,000 |
| 28 | do | do | 25,000 |
| 28 | do | do | 25,000 |
| May 7 | National Bank of Commerce | do | 25,000 |
| 7 | do | do | 25,000 |
| 20 | First National Bank | do | 15,000 |
| 28 | City National Bank | do | 50,000 |
| June 20 | First National Bank, I. Park | do | 14,000 |
| July 3 | City National Bank, W. F. | H. A. Allen | 95,000 |
| 15 | do | Wichita American Production Co. | 50,000 |
| 21 | National Bank of Commerce | W. T. Willis | 25,000 |
| 21 | do | P. P. Langford | 25,000 |
| 25 | do | W. F. Weeks | 25,000 |
| June 14 | Wichita State Bank & Trust Co. | Wichita American Production Co. | 50,000 |
| July 21 | do | H. A. Allen | 25,000 |
| 23 | W. L. Massie | Wichita American Production Co. | 50,000 |
| | | | 624,000 |

All of the above notes were either paid or renewed by the American Refining Co. The other receipts of the Wichita American Production Co. were:

| Date | From | Amount |
|---|---|---|
| 1919 | | |
| May 12 | Wm. Azar, account adjustment of contract to purchase part of lease in Block —— | $3,000.00 |
| 20 | Wm. Azar, account same | 19,500.00 |
| July 10 | Crude Oil Marketing Co., account oil run from Block 87 | 9,988.51 |
| 22 | Crude Oil Marketing Co. account of oil run from Block 87 | 814.60 |
| June 26 | American Refining Co. transfer of funds | 80,000.00 |
| | | 113,303.11 |
| | The disbursements of the Wichita American Production Co. were: | |
| May 12 | Am. Ref. Co., O. & G. Lease | 50,000.00 |
| 19 | Nat'l Bank of Com., transferred from C. N. B. | 2,000.00 |
| 21 | W. M. Azar, A 1 87 | 9,500.00 |
| 23 | Joe Barroch, A 1 87 | 16,250.00 |
| 23 | Joe Barroch, G. Joseph, A 1 87 | 2,750.00 |
| 28 | Sammies Oil Corp., A-6 A 96-97 | 35,000.00 |
| 12 | Am. Refg. Co., Lease, A-3 38.3 A & A-5 10-59 | 100,000.00 |
| 12 | Am. Refg. Co., Bal. on A 1 & A-4 | 55,000.00 |
| June 2 | Dray | 20.00 |
| 2 | 1st Nat'l. Bank B. B. Transfer funds a/c W. S. Ward | 1,000.00 |
| 9 | H. Ralph Connecting Tank | 75.00 |
| 9 | M. M. Cook Survey | 120.00 |
| 9 | Hargrave Printing Co. | 4.63 |
| 9 | W. T. Harris Co. Clerk | 1.00 |
| 14 | W. T. Harris Co. Clerk | 1.50 |
| 14 | Reynolds & Terry A. & G. L. | 1,000.00 |
| 14 | W. T. Harris Co. Clerk | 2.50 |
| 16 | W. Dig. Co. A/4 | 2,500.00 |
| 17 | Reynolds & Terry, A-1 & 3 A | 2,893.55 |
| 17 | Labor | 584.00 |
| 19 | C. N. Bank, 15-A BK 96 A7 | 80,000.00 |
| 19 | H. A. Allen, a/c W. T. Harris | 1.25 |
| 19 | M. & V. Tank—Tanks | 990.00 |
| 21 | Reynolds & Terry | 2,890.00 |
| 26 | C. N. B., Int. 80000 | 108.90 |
| 26 | W. B. Tullon—Dray | 60.00 |
| 27 | First Nat'l Bank—Interest 25,000 note | 296.67 |
| 28 | J. E. Reed—Tanks | 1,000.00 |
| 30 | Reynolds & Terry | 5,000.00 |
| 30 | Labor CKs | 793.00 |
| 14 | Y. E. Hildreth & T. A. Edwards, 15-A 96-A7 | 10,000.00 |
| June 14 | Ford McConkey—Tanks | 1,250.00 |
| | Power Oil Co.—Tanks | 1,550.00 |
| 20 | Rev. Stamps | 2.80 |
| 23 | Burk Metal Works—Tanks | 500.00 |
| 23 | Burk Gas Station—Gas for work | 18.62 |
| 24 | W. E. Thomas Lbr. Co., Lumber | 561.10 |

| Date | From | Amount |
|---|---|---|
| **1919** | | |
| July 1 | Noble Gray Box Cigars | $6.25 |
| 3 | Burk Const. Co.—Tanks | 230.00 |
| 3 | Western Dlg. Co.—Wells 1-2 | 3,000.00 |
| 3 | City Nat. Bank—Rev. Stamps 95000 No | 19.00 |
| 3 | McFall Bros. Ex., Dodge Car | .75 |
| 3 | W. T. Harris C., Clerk | 1.00 |
| 5 | Agt. F. W. & D. C. Frt. Republican Sup | 21.01 |
| 5 | Amer. Refg. Co | 30,000.00 |
| 5 | First Nat'l Bank. Trans. City to 1st | 10,000.00 |
| 5 | Nat'l. Bank of Com. City to Nat'l B. of C | 5,000.00 |
| 5 | Hustead & Tucker—Tanks 3 A | 587.50 |
| 5 | Franklin Service Co. Auto Ex | 108.91 |
| 7 | H. F. Haplow 87 Ex | 100.00 |
| 8 | W. S. Ward Dft., Labor, etc | 1,000.00 |
| 9 | J. B. Touchstone Hauling | 60.00 |
| 10 | Am. Refg. Co | 30,000.00 |
| 10 | Cory Willis Dlg. Co | 4,000.00 |
| 11 | Burk Metal Works—Tanks | 115.00 |
| 12 | Am. Refg. Co. Dep | 10,000.00 |
| 12 | M. & V. Tank Co.—Tanks | 1,425.00 |
| 14 | Burk Gas Station | 14.51 |
| 14 | Alexander Lbr. Co., Lbr. 87 | 173.15 |
| 14 | Frick Reid Sup. Co | 88.68 |
| 14 | Caro Motor Co | 2.75 |
| 14 | Bradford Supply Co | 4,193.40 |
| 14 | Petrolia Supply Co | 1,102.23 |
| 15 | C. N. Bank—Interest | 1,244.34 |
| 16 | First Nat'l Bank—Rental 15 A 59 | 1,000.00 |
| 16 | W. Dlg. Co. 1 & 274 | 7,500.00 |
| 16 | Labor | 1,077.78 |
| 21 | Oil Well Sup. Co | 734.09 |
| 23 | Motor Supply | 777.98 |
| 23 | Rev. Stamps | 10.00 |
| 24 | Ashton & Story—Tanks for 74 | 1,500.00 |
| 24 | Cicero Smith Lbr. 87 | 64.80 |
| 25 | First Nat. Bank for Dep | 10,000.00 |
| 28 | Western Dlg. Co | 4,000.00 |
| 28 | Maxwell Davis Hwde. Co. 87 | 291.50 |
| 29 | C. N. B. Dft. by W. Swork, Labor, etc | 1,000.00 |
| 29 | M. & V. Tank Co.—Tanks 73 | 950.00 |
| 31 | Reynolds & Terry 87 & 74 | 3,467.52 |
| 31 | Amer. Refg. Co., Labor | 1,521.50 |
| 15 | City Nat'l Bk., Deposit | 10,000.00 |
| 26 | First Nat. Bk., Interest | 1,327.50 |
| 15 | City Nat. Bank Dep. from Nat. Bk. of Com | 5,000.00 |
| 22 | Amer. Refg. Co | 25,000.00 |
| Aug. 4 | Lewis & Corey 7-87 | 9,000.00 |
| 5 | Nat. Bk. of Com. Int | 885.00 |
| 5 | Burk Metal Works—Tanks | 115.00 |
| 5 | Nat. Bkl. of Com., Int | 885.00 |
| 5 | R. E. Ditman—Water Station | 1,200.00 |
| 8 | H. G. Beard Pipe for Water Station & 87 | 2,480.00 |
| *12 | Corey Willis Dlg. Co | 22,000.00 |
| 11 | West Dlg. Co. 1-74 | 5,000.00 |
| 12 | P. J. Snell, Burning Grass 73 | 12.00 |
| 12 | Cicero Smith Lbr. Co. Lbr. 87 | 184.30 |
| | Alexander Lbr. Co. 87 & 3 A | 124.70 |
| | Bradford Supply Co | 2,675.40 |
| | Black, Sivalls & Bryson a/c Tanks & repairs | 427.50 |
| | Burk Gas Station | 76.78 |
| | Cont. Supply Co. 87 | 849.05 |
| | Frick Reid Supply Co | 828.35 |
| | Husted & Tucker Hauling Fuel oil (orig. chg. to Inv.) | 372.00 |
| | Maxwell Hdw. Co. supplies | 5.85 |
| | Maxwell Davis | 299.35 |
| | Republic Supply Co | 31.34 |
| | Nat'l Supply Co | 536.51 |
| | Randlearet Supply | 1.25 |
| | Patterson Ruse & Brothers | 74.25 |
| | W. Falls Battery Co. Auto | 52.60 |
| 14 | Lewis & Carey  Bal on well—82 | 2,200.00 |
| 16 | Am. Refg. Co. Transfer (C. N. B.) | 38,756.23 |
| 15 | Am. Refg. Co. Transfer (1st N. B.) | 8,789.98 |
| 9 | Am. Refg. Co. Transfer (N. B. of C.) | 25,000.00 |
| 18 | Am. Refg. Co. Transfer (N. B. of C.) | 25,000.00 |
| 12 | Wichita State Bank, Int | 676.67 |
| 18 | Am. Reft. Co. for Dept | 25,640.69 |
| June 14 | Wichita St. Bank, Int | 676.64 |
| 16 | Am. Reft. Co | 30,000.00 |
| 16 | C. N. B. of C | 10,000.00 |
| 18 | Carey Willis | 6,000.00 |
| 21 | Jno. W. Ownes Co., 15 a 96 | 1,500.00 |
| 25 | W. T. Harris Co., Clerk | 1.00 |
| July 21 | Wichita St. Bk., Int | 605.00 |

As above shown, the American Refining Co. acquired the Waggoner Lease on 20 acres on April 18, 1919; they also acquired the Vogel Lease on 10 acres on May 2, 1919.

A well was completed on the Waggoner Lease on June 5, 1919, showing an initial flow of 2,500 barrels a day. At the time that this property was acquired no flowing well was in existence within a quarter mile thereof. The value of this lease on the 20 acres of land on July 5, 1919, was $750,000, and the oil reserves on that date were 500,000 barrels. The production of oil on this lease is shown by the following schedule:

| | Blk 87 8/8 Barrels | | Blk 87 8/8 Barrels |
|---|---|---|---|
| **1919:** | | **1920:** | |
| June | 22, 301. 62 | August | 14, 138. 36 |
| July | 18, 957. 75 | September | 12, 658. 80 |
| August | 57, 792. 42 | October | 12, 859. 36 |
| September | 29, 097. 17 | November | 12, 736. 83 |
| October | 16, 858. 84 | December | 12, 230. 86 |
| November | 11, 157. 26 | | |
| December | 3, 551. 46 | | 149, 818. 66 |
| | 159, 716. 52 | **By years:** | |
| | | 1921 | 122, 045. 96 |
| **1920:** | | 1922 | 66, 282. 99 |
| January | 7, 215. 32 | 1923 | 57, 753. 21 |
| February | 10, 341. 64 | 1924 | 35, 468. 82 |
| March | 10, 546. 42 | 1925 | 25, 847. 06 |
| April | 14, 358. 00 | | |
| May | 13, 080. 28 | | 307, 397. 85 |
| June | 13, 880. 61 | | |
| July | 15, 772. 18 | | 616, 933. 22 |

As stated above, the Vogel Lease was acquired May 2, 1919. On September 20, 1919, the first well on this property was drilled to the oil sands and showed an initial flow of 200 barrels per day. At the time this lease was acquired there was no well producing oil within a quarter of a mile thereof. The production of oil from this lease is shown as follows:

| | Blk 74 8/8 Barrels | | Blk 74 8/8 Barrels |
|---|---|---|---|
| **1919:** | | **1920:** | |
| September | 6, 356. 26 | September | 10, 037. 48 |
| October | 7, 465. 35 | October | 8, 381. 96 |
| November | 8, 320. 44 | November | 9, 951. 00 |
| December | 8, 406. 58 | December | 6, 857. 70 |
| | 30, 548. 63 | | 116, 937. 63 |
| **1920:** | | **By years:** | |
| January | 5, 342. 91 | 1921 | 61, 468. 41 |
| February | 6, 354. 20 | 1922 | 38, 017. 94 |
| March | 8, 475. 30 | 1923 | 23, 357. 21 |
| April | 15, 528. 76 | 1924 | 12, 870. 56 |
| May | 14, 781. 30 | 1925 | 10, 345. 16 |
| June | 11, 541. 48 | | |
| July | 11, 177. 58 | | 146, 059. 28 |
| August | 11, 507. 96 | Total | 293, 545. 54 |

The value of the lease on this 10 acres of land on October 20, 1919, was $350,000, and the oil reserves on that date were 300,000 barrels.

During the years 1919 and 1920 the American Refining Co. purchased tank cars f. o. b. Sharon, Pa. The cost of the cars to the company was the price paid, plus the freight. The rate of depreciation on the cars is 8 per cent per annum, on such cost, from the date of delivery. The date on which the cars were delivered, the number of cars, and the total cost of each delivery are as follows:

| Date of delivery | Number of cars | Total cost | Date of delivery | Number of cars | Total cost |
|---|---|---|---|---|---|
| June 19, 1919 | 30 | $65,807.40 | Nov. 6, 1919 | 2 | $4,987.16 |
| June 25, 1919 | 18 | 39,484.44 | Nov. 25, 1919 | 2 | 4,687.16 |
| Aug. 5, 1919 | 9 | 19,742.22 | Nov. 26, 1919 | 15 | 35,153.70 |
| Aug. 6, 1919 | 4 | 8,774.32 | Nov. 28, 1919 | 2 | 4,687.16 |
| Aug. 7, 1919 | 4 | 8,774.32 | Nov. 29, 1919 | 3 | 7,030.74 |
| Aug. 8, 1919 | 3 | 6,580.74 | Dec. 4, 1919 | 10 | 23,435.80 |
| Aug. 16, 1919 | 16 | 35,097.28 | Jan. 16, 1920 | 5 | 11,717.90 |
| Sept. 6, 1919 | 16 | 35,097.28 | Jan. 19, 1920 | 8 | 18,748.64 |
| Sept. 10, 1919 | 28 | 65,620.24 | Jan. 20, 1920 | 2 | 4,687.16 |
| Sept. 25, 1919 | 6 | 14,061.48 | Jan. 23, 1920 | 7 | 16,405.06 |
| Sept. 29, 1919 | 2 | 4,687.16 | Jan. 28, 1920 | 1 | 2,343.58 |
| Oct. 6, 1919 | 3 | 7,480.74 | Jan. 29, 1920 | 5 | 11,717.90 |
| Oct. 8, 1919 | 5 | 12,467.90 | Mar. 1, 1920 | 10 | 24,935.80 |
| Oct. 10, 1919 | 4 | 9,974.32 | Aug. 25, 1920 | 24 | 71,203.20 |
| Oct. 25, 1919 | 1 | 2,343.58 | Sept. 9, 1920 | 33 | 98,591.79 |
| Nov. 5, 1919 | 25 | 62,339.50 | Sept. 15, 1920 | 23 | 68,715.49 |
| Nov. 5, 1919 | 3 | 7,030.74 | Sept. 20, 1920 | 20 | 59,752.60 |
| Nov. 7, 1919 | 1 | 2,493.58 | | | |

Some time prior to January 1, 1919, the petitioner began the erection of a refinery located not far from the properties which it later acquired in Wichita County, Texas. The expenditures for plant at January 1, 1919, amounted to $83,686.30. Additional expenditures were made as follows:

Additional, 1919:

| January | $11,419.03 |
| February | 42,857.42 |
| March | 48,076.99 |
| April | 34,746.77 |
| May | 36,083.50 |
| June | 35,918.02 |
| July | 53,620.10 |
| August | 41,468.13 |
| September | 30,090.66 |
| October | 28,251.03 |
| November | 50,379.19 |
| December | 23,642.40 |

Additional, 1920:

| January | $12,686.43 |
| February | 22,172.62 |
| March | 12,394.94 |
| April | 2,099.65 |
| May | 5,718.06 |
| June | 10,370.46 |
| July | 9,055.25 |
| August | 1,383.63 |
| September | 12,115.82 |
| October | 17,719.66 |
| November | 3,673.16 |
| December | 5,741.46 |

The petitioners in their original petitions claimed depreciation on this plant and equipment at the rate of 12½ per cent per year. In amendments to their petitions this claim was revised to 33⅓ per cent. Respondent allowed 10 per cent depreciation. The plant as constructed had a capacity of about 4,000 barrels of crude oil a day, and was of the type known as a skimming or topping plant. This

plant was in use until about 1924, when new equipment was installed which constituted a great improvement on the method of producing refined products from crude oil, popularly known as "the cracking process.". Refinery plants are subject to depreciation on account of excessive corrosion due to sulphur and sulphur fumes in the crude oil and to the heat required in the refining of the crude oil. Refinery plants were also subject to obsolescence due to the exhaustion of the available crude oil supply and to the changes in methods of refining. The rate of depreciation on the refinery plant of petitioners for the years 1919 and 1920 was 12½ per cent.

In 1920 the American Refining Co. paid to the State of Texas $671.42 as a penalty for neglecting to report to the auditor of that State their gross production of oil. The company had been producing oil since June, 1919.

During the year 1919 the partners of the American Refining Co. were not aware of the existence of the tax imposed by section 500 of the Revenue Act of 1918 on the transportation of oil by pipe line. In 1920 the respondent determined a tax upon a transportation charge of 12½ cents per barrel. This tax the company contested, but set up a reserve in that year (1920) to cover this tax at the rate of the transportation charge determined by respondent. The total reserve set up for the years 1919 and 1920 was $10,060.96, of which $2,249.91 was set up for 1919, and $7,811.05 was applicable to the year 1920. The total reserve set up for this purpose for the years 1919 and 1920 and certain subsequent years, the number of which is not disclosed, was $17,233.02. All this reserve was set up on the basis of 12½ cents per barrel transportation charge. In 1924, the partnership settled with the Government and paid for the years in question and said subsequent years $9,610.96. This settlement was made on the basis of a transportation charge of 7½ cents per barrel.

In 1920 the American Refining Co. paid $750 to the Open Shop Association of Wichita Falls, Tex. This association was composed of employers of labor who organized to protect themselves from what they conceived to be the danger of union labor. The American Refining Co. was employing nonunion labor and feared that if their employees were unionized the result would be a higher cost of operation for their plant.

In November, 1920, the American Refining Co. purchased an oil lease on the W. ½ of the NW. ¼, sec. 10, T. 5 S., R. 15 W., Tillman County, Oklahoma, for $8,006.00. This was on Indian land. In 1920 the company charged off this lease as worthless. No well was sunk on the property and the partnership retained the lease throughout the year 1920. There were wells sunk during 1920 east and southeast and north of this tract, which proved dry. Those sunk southeast of the tract were between it and the Burkburnett Field and the

nearest was over 2½ miles away. The nearest on the northwest was over 1½ miles away. About two years later the Hirshey Field in Texas, just across the Arkansas River and about 1 mile away, was developed and proved valuable. No well has been sunk between the leased tract and the Hirshey tract.

OPINION.

MILLIKEN: The questions at issue will be discussed in the order in which they have been stated.

The first issue is whether petitioners received a liquidating dividend from the Wichita American Production Co., hereafter called the Production Co. Respondent has determined this dividend as a whole at the amount of $504,701.80. He arrived at this amount in the following manner:

| Lease | Cost | Depleted value August 7, 1919 | Depleted value June 30, 1919 |
|---|---|---|---|
| A-1 (Waggoner) | $58,500.00 | $492,079.38 | |
| A-2 | 7,000.00 | 7,000.00 | |
| A-3 (Meadows) | 50,000.00 | 75,000.00 | |
| A-4 (Vogel) | 70,500.00 | | $159,257.81 |
| A-5 | 50,000.00 | 10,000.00 | |
| A-6 | 35,000.00 | 35,000.00 | |
| A-7 | 91,500.00 | 91,500.00 | |
| | 362,500.00 | 710,579.38 | 159,257.81 |
| | | 159,257.81 | |
| | | 869,837.19 | |
| Less: Lease cost | | 362,500.00 | |
| | | 507,337.19 | |
| Operating deficit | | 2,635.39 | |
| Liquidating dividend | | 504,701.80 | |

It is not clear what elements respondent took into consideration in arriving at the amount which he terms the operating deficit. Petitioners claim that respondent did not include in this amount the $624,000 borrowed by the Production Co., and which was paid or renewed by the American Refining Co., hereafter called the Refining Co. Respondent claims that this indebtedness was taken into consideration in arriving at the amount of the operating deficit. This question we do not decide in view of the conclusion which we have reached. It is proper, however, to point out that respondent has included in what he terms the liquidating dividend the appreciation in value of two leases which were never the property of the Production Co. These leases are A-1, the Waggoner Lease, and Lease A-3, the Meadows Lease.

The Meadows Lease was transferred and assigned on April 25, 1919, to Bashara, Silk and Langford as trustees for the Refining Co. The consideration, $50,000, was paid by the Refining Co.

Each of the three trustees testified that they made no further transfer of the lease. This lease was taken in the name of the trustees of the partnership before the articles of incorporation were acknowledged and remained in their names as trustees during the whole period in question.

The Waggoner Lease was purchased by the Refining Company on April 18, 1919, for the sum of $40,000, paid out of their funds and the title was taken in the names of the same persons, to wit, Silk, Bashara and Langford. It is true that they were not termed trustees in the conveyance, but the consideration was paid out of partnership funds and no one claims that the lease was the individual property of Silk, Langford, and Bashara. The lease was purchased about two weeks before the articles of incorporation were filed. The trustees claim that they held the lease as trustees for the partnership. Their statements are borne out by the record. Respondent relies on the following transactions. He points out that on June 30, 1919, these persons conveyed the same lease to themselves as trustees for the partnership. The trustees state that they did this only to put on record that which was an existing fact. Since the lease was acquired before there was a corporation even *de facto*, for which they could be trustees, and since the consideration was paid by the partnership, their version is not only reasonable but in accord with the facts. Next, respondent relies on a letter written on the letterhead of the Refining Co., dated July 23, 1919, and directed to the Magnolia Petroleum Co. This letter was written in reply to a request by the Magnolia Petroleum Co. for information as to who was the owner of certain oil which was being run into their tanks from the ground covered by the Waggoner Lease. The letter enclosed what purported to be a copy of an opinion of certain attorneys, dated July 9, 1919, to the effect that title to the lease was in the Production Co. Respondent also produced in evidence a division order directed to the Magnolia Petroleum Co. which was dated June 24, 1919, and which was signed by Silk, Langford and Bashara, as trustees, in which it was stated that the lease was the property of the Production Co. This division order was prepared by the Magnolia Petroleum Co. subsequent to September 8, 1919, and was signed by the trustees at a date which does not appear, but which of course was subsequent to its preparation. It should be noted that both the letter of July 23, 1919, and the copy of the attorneys' opinion were dated subsequent to June 30, 1919, the date on which the trustees by the assignment of that date confirmed the title of the partnership, and that the division order was signed long after the Production Co. had been dissolved. Silk testified that all this was done to clear up the records of the Magnolia Petroleum Co. and in order that the partnership might get its oil. Whatever may have been the cause of these

peculiar representations, it is clear that on the dates on which they were signed and delivered the Production Co. had no title whatever to the lease and it is also clear that, whatever may have been their effect on the rights of the Magnolia Petroleum Co., they could not as between the partnership and the Production Co. transfer the title from one to the other.

In order to understand the above transactions and those which will now be discussed it should be remembered that Wichita County was during these times in the throes of an oil boom. Excitement, irregularities and nonconformity were the order of the day. The right hand did not know what the left hand was doing. Another pertinent fact is that no one, unless he was a member of the partnership, lost one cent by reason of any of these transactions.

The pertinent sections of the Texas statute which were in effect when the American Production Co. filed its articles of incorporation were articles 1125, 1126, 1127, and 1132 of Vernon's Sayles' Texas Civil Statutes (1914). These articles read:

ART. 1125. The stockholders of all private corporations created for profit with an authorized capital stock under the provisions of this chapter, shall be required in good faith, to subscribe the full amount of its authorized capital stock, and to pay fifty per cent. thereof before said corporation shall be chartered.

ART. 1126. Whenever the stockholders of any such company shall furnish satisfactory evidence to the secretary of state that the full amount of the authorized capital stock has in good faith been subscribed and fifty per cent. thereof paid in cash, or its equivalent in other property or labor done, the product of which shall be to the company of the actual value at which it was taken, or property actually received, it shall be the duty of said officer, on payment of office fees and franchise tax due, to receive, file and record the charter of such company in his office, and to give his certificate showing the record thereof.

ART. 1127. Satisfactory evidence above mentioned shall consist of the affidavit of those who executed the charter, stating therein: 1. The name, residence and post-office address of each subscriber to the capital stock of such company. 2. The amount subscribed by each, and the amount paid by each. 3. The cash value of any property received, giving its description, location and from whom and the price at which it was received. 4. The amount, character and value of labor done, from whom, and price at which it was received.

ART. 1132. The existence of the corporation shall date from the filing of the charter in the office of the secretary of state, and the certificate of the secretary of state shall be evidence of such filing.

Respondent contends upon the filing of the articles of incorporation in the office of the secretary of state of the State of Texas, there was in existence a corporation *de facto*. He bases this contention on the provisions of article 1132 which provided " the existence of the corporation shall date from the filing of the charter in the office of the Secretary of State  *  *  *."

In further support of his contention he cites *National Bank v. Texas Investment Co.*, 74 Tex. 421; 12 S. W. 101, and cases from other States. In the *Texas Investment Co.* case the court held that under a then existing statute of Texas it was only necessary to the existence of the corporation that its articles be filed with the secretary of state and the fact that no stock was subscribed or paid in was not so essential as to deprive the incorporators of the benefits of corporate existence. The court further held that a false statement by the incorporators to the effect that stock had been issued and paid for rendered them liable only for damages in an action for deceit. Petitioners assert that the above case is not applicable since the then existing Texas statutes did not contain the provision found in article 1125 to the effect that the full amount of capital stock must be subscribed and 50 per cent paid in " before said corporation shall be chartered." Respondent replies that this is a fact to be shown by the affidavit required by articles 1126 and 1127, and when so shown its truth can not be questioned by the incorporators since they can not assert their own fraud. Compare *Wells Co. v. Gastonia Co.*, 198 U. S. 177. Petitioners cite cases from States other than Texas which hold that under the peculiar provisions of local statutes the subscription to stock is necessary to create a corporation *de facto*. Cf. *Appeal of Niles Fire Brick Co.*, 6 B. T. A. 8. On the other hand, there are numerous authorities holding to the contrary.

We do not find it necessary to decide whether the Production Co. was or was not a *de facto* corporation. The question before us is whether the various petitioners were in receipt of a liquidating dividend. A corporation ordinarily distributes its property by way of dividend. Neither party has asserted and the record contains not an iota of evidence to the effect that the Refining Co. as a partnership subscribed for a share of stock in the Production Co. or that the Refining Co. was in any way a stockholder in the Production Co. When we come to the members of the partnership we find the same to be true. Under the rule laid down in *National Bank v. Texas Investment Co.*, *supra*, Bashara, Kilgore and Weeks did not become stockholders by reason of the statements contained in their affidavit, but were liable only for fraud. Much less can it be held that the petitioners were stockholders. They not only did not sign the articles of incorporation or the affidavit, but at the time of filing thereof were ignorant of the whole matter. Not one of them subscribed for stock or paid in a penny.

Allen was ill when the articles were filed with the secretary of state, and knew nothing of it. He never subscribed for a share of stock, was never elected a director or an officer and never agreed that any part of his interest in the partnership should be transferred

to the corporation. He was secretary and treasurer of the partnership and had charge of both the books of the partnership and the books of the corporation. When asked if he was not surprised when, after his return to the office, he discovered that no part of the capital stock of the corporation had been subscribed or paid in, he replied in the negative and gave as a reason for his answer that he found that it had already been determined to dissolve the corporation. Maer testified that the first he heard of the corporation was when he read it in a newspaper and that he raised no formal objection because he was informed that the corporation was to be dissolved. Silk testified that he first heard of the corporation while he was watching the drilling of the first well on the Waggoner tract. He saw a motor car with the name of the corporation on it, and upon inquiry was informed of what had taken place. He at once objected to the whole proceeding. Willis testified that he never heard of the corporation until he was approached long afterward about back payments of income tax. None of the above statements, nor many of the same character made by other members of the partnership, are contradicted by any testimony introduced by the respondent.

Stock can be acquired only by purchase, gift, bequest, descent, or as a stock dividend. One can not be made a stockholder against his consent. By no stretch of the law or of the imagination can we hold that any one of the petitioners was a stockholder in the Production Co. If none of them was a stockholder, how could he be in receipt of a dividend whether ordinary or in liquidation? It is the function of a dividend to convert the property of the corporation into the property of the individual stockholders. Cf. *United States* v. *Phellis*, 257 U. S. 156. Here we have no stockholders.

The fact remains, however, that the Refining Co. did come into possession of the assets of the Production Co., and likewise became obligated for all its debts. If the Refining Co. did not acquire these assets by purchase, gift, or as a dividend, there remains but one hypothesis, and that is that the partnership was the owner of these assets and liable for these debts during the whole period.

We have for consideration the shadow of a corporation, without officers, without stockholders, without capital stock, and which operated either on the capital of the partnership or on borrowed money, all of which was either paid or renewed by the partnership. During all this time we have also the partnership which was a vital going concern before the filing of the articles of incorporation, was active in business during the three months of so-called corporate existence, and which existed after the Production Co. had faded from the picture. This partnership acquired not as a gift, not by contract, and not by way of dividend, all the assets of the Production Co. and paid or renewed all its notes for borrowed money.

The facts make this case an unusual and exceptional one and one where the rule of looking through form to substance may be involved. We can find no authority for the anomaly of holding persons to be in receipt of a dividend who not only were not stockholders in the corporation but who objected to its existence. We are of opinion that respondent erred in determining that any one of the petitioners received a liquidating dividend.

Petitioners claimed discovery value on the Waggoner and Vogel Leases. As shown in the findings of fact, they are entitled to this value. The only issue is the amount. On this question petitioner introduced two witnesses, W. T. Willis, one of the petitioners, and W. M. Priddy, who is at the present time president of the Refining Co.

Mr. Willis was asked the following question with reference to the Waggoner Lease:

Q. Now that statement shows that that well produced from June 5, 1919, to the close of that month, 22,301.62 barrels in 25 days. Will you give us your opinion of the fair market value of that lease on that 20 acres of land with the one well on it producing at that rate, exclusive of all the improvements, on or about July 5, 1919?

A. I would say from a million and a half to two million dollars.

This witness was also asked his opinion of the value of the lease known as the Vogel Ten Acres, and the following appears in the record:

Q. Now, Mr. Willis, it is in the testimony that the first well was completed on that property on August 10, 1919, and that the next well was completed on September 20, 1919, or approximately that date, and that that first well produced during the month of September 6,354.26 barrels, and there is the exhibit which purports to show the entire production of the property. * * * Examine that production record and with that in mind and with your knowledge and experience up there state what in your opinion was the fair market value of that oil and gas lease, exclusive of improvements, on September 10, 1919.

A. About $700,000.00.

A similar question was propounded to Priddy with respect to the value of the Waggoner Lease, and Priddy replied that the value of the lease was $1,750,000. He fixed the value on the Vogel Lease as $750,000.

On the cross-examination of Priddy, the respondent presented a Form O, which had been made out by the Refining Co. and signed by Priddy as president and H. A. Allen as secretary and treasurer. In Form O the Waggoner Lease was valued at $750,000 and the Vogel Lease at $350,000. Priddy identified his signature to the exhibit.

Neither witness indicated the manner in which he arrived at his estimate of the value of the leases or the data upon which he depended. The questions propounded to them were not sufficiently com-

prehensive and did not present a situation which would enable one to arrive at a proper determination of the value of the leases. Form O contains maps which show that additional wells were drilled within the discovery period in the immediate neighborhood of the Waggoner and Vogel Leases. The flow and value of these wells would have a material bearing on the value of the leases involved, but neither witness seems to have taken these matters into consideration.

The respondent in determining the value of these leases did not value them for discovery in the hands of the Refining Co., but valued the Waggoner Lease as of August 6, 1919, and the Vogel Lease as of June 30, 1919. There has been therefore, no determination by respondent of the value of these properties on the dates of discovery. Form O was introduced in evidence by the respondent and contains the only evidence before us that is not open to serious objection.

We are of opinion that the values fixed by Form O on the Waggoner and Vogel Leases, of $750,000 and $350,000, respectively, represent the fair market values of these leases on the dates of discovery and are the proper bases for the determination of depletion based on the oil reserve of 500,000 barrels in the Waggoner Lease and of 300,000 barrels in the Vogel Lease.

The only matters in dispute between respondent and the petitioners with reference to depreciation of the tank cars owned by the Refining Co. were the cost of the cars and the date from which depreciation should be determined. By stipulation the parties agreed that the cost of the tank cars was the price plus freight, and that the date from which depreciation should be determined was the date of shipment. They also agreed upon the rate.

The proper rate of depreciation of the refinery of the Refining Co. for the years 1919 and 1920 should be based upon facts and conditions known or ascertainable during those years. While several of the witnesses for petitioners indicated that they believed that a rate of depreciation from 20 to 40 per cent was proper, it is evident from a reading of their testimony that this estimate was based upon facts as they now exist rather than as they existed in the years in question. The petitioners are asking that the values of their leases be determined by the situation as it existed in 1919, and on the other hand that depreciation should be determined by facts subsequently discovered. Depreciation, like value, should be determined by the conditions existing at the time the depreciation is claimed. The record discloses that the Refining Co. spent some $440,000 in additions to its refinery in 1919, and about $118,000 during 1920. These expenditures would indicate that the parties were not then expecting that the oil fields would be depleted as rapidly as subsequent events have shown to be true. The maps filed with Form O show that

numerous oil wells were drilled in the field in 1920 and that large areas in the interior of the properties in the oil field were still undrilled. Petitioners emphasize the fact that their refinery as built has at the present time become practically obsolete and that what is known as the " cracking " process was substituted. However, according to the testimony of Priddy, the cracking process was not installed until 1924. There is nothing in the record to indicate that this process was a commercial success by the close of 1920, or that it was in general use at that time.

In Form O the Refining Co. requested that the rate of the depreciation on the refinery be determined at 12½ per cent per annum. Respondent allowed 10 per cent. In their original petition the petitioners requested depreciation at the rate of 12½ per cent. After testimony had been taken and at the hearing they, by amended petition, increased their demand to 33⅓ per cent. On all the testimony we are of opinion that the rate originally requested by the Refining Co. and again requested by the petitioners in their original petition is the proper rate of depreciation.

Section 7071 of Vernon's Annotated Texas Civil Statutes, Title 122, chap. 2, vol. 20, 1925, imposes a tax of 2 per cent on the value of oil produced and requires quarterly reports. Subsection 6 of this section provides:

> Any person failing to make proper and accurate report for thirty days from the date when said report is required herein to be made shall forfeit and pay to the State of Texas a penalty of ten per cent of the amount of the tax due for the quarter for which said report is required by law to be made.

In pursuance of the above, the State of Texas imposed a penalty on the refining company of $671.42, which they paid in 1920. Without deciding whether this payment would be a proper deduction if the penalty had been imposed in 1920 it is sufficient to point out that the refining company kept its books on an accrual basis and that the evidence does not disclose in what year the penalty was imposed. It is shown that the refining company was producing oil during 1919. It may be for all that appears, that penalty was imposed for 1919. Upon the facts shown we can not hold that the respondent erred in rejecting this deduction.

Without passing on the merits of petitioners' contention relative to the right to deduct from the gross income of the refining company in 1919 taxes due in that year under section 500 of the Revenue Act of 1918, it is only necessary to state that it is impossible to discover from the facts adduced in evidence what parts of the $9,610.69 paid in 1924 are applicable to the years 1919 and 1920, respectively. This deduction must, therefore, be disallowed.

We are of the opinion that the contribution to the Open Shop Association was an expenditure directly connected with the business

of the Refining Co. and is deductible as an ordinary business expense. See *Appeal of Independent Brewing Co. of Pittsburgh*, 4 B. T. A. 870, and *Richmond Hosiery Mills* v. *Commissioner*, 6 B. T. A. 1247.

Respondent did not err in refusing to permit the deduction from the gross income of the Refining Co. in 1920 of the alleged loss of $8,006 paid in 1919 for an oil lease in Tillman County, Oklahoma. While it is shown that wells have been sunk between the tract leased and the Burkburnett Field, which have proven dry, it further appears that the nearest dry well was over one and a half miles away. On the other hand, no well has been sunk on the tract leased, and no well has been drilled between it and the Hirshey Field which is only about one mile away, and which it appears came in after 1920. Petitioners depend on this question on the testimony of W. W. Fraser. On cross-examination this witness was asked:

Q. According to this map, in 1920 there is shown a number of producing wells immediately south and immediately across the Red River from the lease indicated in Hirshey area, in this area.

A. That is known as the Hirshey area.

Q. If the drilling of a dry hole on this lease to the north of the river proved that area valueless why was it that there was production immediately south of the river over a year or almost two years later?

A. It proved it valueless at that time. It wouldn't prove it valueless for all time.

This testimony disposes of the question of value and renders it unnecessary for us to decide whether the Refining Co. would have been entitled to this deduction, they not having surrendered their lease, had the lease proved worthless in 1920.

The remaining questions relate to the complaints of Maer and wife, to the effect that respondent erred in deducting from the cost of the Maer-Silk-Willis Lease depreciation and depletion which had been theretofore allowed and also in determining the amount of gain arising from the sale in 1920 by petitioners of their interest in the Refining Co. No evidence has been produced on either of these issues. Respondent did not err in deducting depletion and depreciation from the cost price. See *United States* v. *Ludey*, 274 U. S. 295.

With reference to the overassessment for the year 1920 in the case of Mr. and Mrs. W. T. Willis, it is only necessary to point out that the Board is without jurisidiction to revise a determination by respondent of an overassessment for any year. See *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255, and *Appeal of Cheney D. Washburn*, 7 B. T. A. 483.

Reviewed by the Board.

*Judgment will be entered on 30 days' notice, under Rule 50.*